IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARK A. GUTHRIE,

Plaintiff,

v.                                                    Civil Action No. 3:07-CV-141

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.      Background

        Plaintiff, Mark Guthrie (Claimant), filed a Complaint on October 30, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

November 3, 2008.[2]  Claimant filed his Motion for Summary Judgment on December 15, 2008.[3]

Commissioner filed his Motion for Summary Judgment on February 19, 2009.[4]

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

        2.      Defendant's Brief in Support of Motion for Summary Judgment.

---

        [1] Docket No. 1.

        [2] Docket No. 9.

        [3] Docket No. 15.

        [4] Docket No. 18.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ followed the applicable law in his application of the established pain and credibility standards and his decision was supported by substantial evidence.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. Facts

A.     <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on October 20, 2004 alleging disability since April 1, 2004 (Tr.51), due to a right knee injury. (Tr. 65). The claim was denied initially on March 4, 2005 (Tr. 31). Thereafter, on April 5, 2005, Claimant filed a Request for Reconsideration. (Tr. 36). The claim was denied upon reconsideration on October 17, 2005. (Tr. 31, 37). Claimant filed a written request for a hearing on December 7, 2005. (Tr. 40). Claimant's request was granted and a hearing was held on November 8, 2006 (Tr. 44, 327).

The ALJ issued an unfavorable decision on March 14, 2007 (Tr. 14-28). The ALJ determined Claimant was not disabled under the Act because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526) and that he retained the retained the residual functional capacity to perform the functional demands of a restricted range of light exertional work, or work which requires maximum lifting of twenty

pounds and frequent lifting of ten pounds. (Tr. 20). On May 4, 2007, Claimant filed a request for review of that determination. (Tr. 12-13). The request for review was denied by the Appeals Council on August 31, 2007 (Tr. 6-8). Therefore, on August 31, 2007 the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on February 5, 1958 and was forty-six (46) years old as of the onset date of his alleged disability and forty-nine (49) as of the date of the date of the ALJ's decision. (Tr. 51, 61). Claimant was therefore considered a "younger person," under age 50, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Claimant graduated from high school and has past relevant work as an auto mechanic and a construction worker. (Tr. 66, 71).

C.    Medical History

The following medical history is relevant to the sole issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints of pain and functional limitation were not entirely credible:

**West Virginia University Hospital Emergency Dept., April 1, 2004, (Tr. 131-146)**

Claimant reported to the ER after injuring his knee in an automobile accident. David Hubbard, M.D. diagnosed a fracture of the right patella with severely comminuted distal pole. Surgery was recommended, but Claimant opted against it that day. He tentatively scheduled an appointment with Dr. Silverstein.


**Gregg O'Malley, M.D., Consultation Report, April 2, 2004, (Tr. 147-162)**

Four views of the right patella obtained in the emergency department revealed a comminuted right patellar fracture, which is transverse in nature with comminnution distally.

Assessment and Plan - Patient was placed back in his knee immobilizer and instructed to take Ibuprofen 600 mg three times a day for the next five days. Surgery to be scheduled.

## Scott Silverstein, M.D., Report of Operation, April 8, 2004 (Tr. 163-176)

Dr. Silverstein performed a partial patellectomy with repair of the patellar tendon and retinaculum of claimant's right knee. Claimant went to the recovery room in stable condition.

## Tygart Valley Rehabilitation & Fitness, Progress Notes, 4/16/04-8/16/04 (Tr. 177-183)

Claimant attended physical therapy at Grafton City Hospital Tygart Valley Rehab and Fitness for four months following his surgery. He was cooperative and compliant and his rehab potential was considered to be good. He progressed slowly, but steadily with his range of motion. He was discharged on 8/16/2004. At that time he was still unable to fully kneel or squat on the right knee.

## Monongalia General Hospital, MRI Report, 11/23/04, (Tr. 194-195)

Claimant complained of right knee pain. An MRI of his right knee was taken and the following were found:
1. Degenerative type signal in the lateral meniscus
2. Defect at the patella due to the previous fracture
3. Thickening in the distal quadriceps tendon as well as patellar tendon

## Mountainstate Orthopedic Association, Scott Silverstein, M.D., 4/6/04-12/22/04, (Tr. 196-203)

Following the surgery, Dr. Silverstein provided follow-up care to Claimant until December, 2004.
April 16, 2004 - Can't quite do a straight leg raise yet even with a little bit of assistance.
May 4, 2004 - He is doing fair. He still has a good bit of quad inhibition. He is not taking any pain medication. No Homan's. No redness. No warmth. Claimant says he is getting his knee to 33 degrees.
June 1, 2004 - He is doing reasonably well, he has gone without his immobilized some of the time and it is not feeling too badly. He has slight lag with his straight leg raise, but not much of one. His ligament exam is pretty stable and he has negative Homans, no calf tenderness. He is improving, albeit slowly.
June 29, 2004 - He is really doing pretty well. Still doesn't have great quad strength and he has some occasional anterior knee pain, but its getting better over time. He can do straight leg raise without any kind of a lag.
August 10, 2004 - He is still hurting but is getting better over time. Knee today has maybe a

trace effusion at most, he's got a little irritability in deep flexion, his wounds look good. He can do a straight leg raise with no lag.

November 9, 2004 - He is doing fair at this point. He is not taking anything even over the counter for it and not even any Tylenol. He has some crepitation behind his knee cap, his wound is well healed. His x-rays look fine. Dr. suspects Claimant is getting arthritic. They discussed injections and other things to alleviate this.

November 18, 2004 - Claimant continued to have pain and discomfort and asks if possible injection would help him. He has a good straight leg raise. He has pain over the patellar tendon, mainly it seems like a lot of tendinitis, but he has good strength. Stability-wise his anterior drawer seems a little lax. He has a little bit of recurvatum. He has no rotary instability, no medial or lateral instability. His complaints seem to be more with steps and stairs so this could be some sort of PCL type injury that is giving him pain.

December 2, 2004 - Discussed MRI results. MRI didn't show anything serious.

December 22, 2004 - He really has no effusion, he is tender behind his patella. He does have a little bit of increased laxity. His MRI doesn't look bad. His ACL and PCL look fine and his posterior lateral corner and menisci look fine.

## State Agency Physician Residual Functional Capacity Assessments, (Tr. 204-211, 212-219)

Fulvio R. Franyutti, M.D. 2/24/2005

Exertional Limitations:
Occasionally lift and/or carry ten pounds.
Frequently lift and/or carry ten pounds
Stand and/or walk for a total of at least two hours in an 8-hour workday
Sit for a total of about six hours in an 8-hour workday
Push and/or pull - unlimited

Postural Limitations:
Occasional climbing, balancing, stooping, kneeling, crouching and crawling.

No manipulative, visual or communicative limitations

Environmental Limitations:
Avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, gases, poor ventilation and hazards such as machinery, heights, etc. Unlimited exposure to wetness, humidity and noise.

Atiya Lateef, M.D. 10/12/05

Exertional Limitations:
Occasionally lift and/or carry 20 pounds.

Frequently lift and/or carry ten pounds
Stand and/or walk for a total of at least six hours in an 8-hour workday
Sit for a total of about six hours in an 8-hour workday
Push and/or pull - unlimited

Postural Limitations:
Occasional climbing (never ladders, ropes or scaffolds), balancing, stooping, kneeling and crouching and no crawling.

No manipulative, visual or communicative limitations

Environmental Limitations:
Avoid concentrated exposure to extreme cold and vibration. Unlimited exposure to extreme heat, wetness, humidity, noise and fumes, odors, gases, and poor ventiliation. Avoid even moderate exposure to hazards such as machinery, heights, etc.

## Matthew P. Darmelio, M.D., Physical Exam and X-ray, 11/1/2005, (Tr. 295)

Claimant complains that his knee has been bothering him for the last three to four weeks. He has crepitus in the knee joint and gets a lot of discomfort in it.

Physical Examination - His is stable to varus and valgus stress test at 5 and 30 degrees. He has a negative Lachman's, negative posterior drawer. He has a range of motion of 0/0/130 degrees.

X-ray shows he has a congruent joint space. He really doesn't have much in the way of arthritic wear. The patella is actually fairly congruent.

Dr. Darmelio doesn't see how he is going to get back to doing construction work.

## Pinewood Medical Center, James E. Malone, D.O., 2/22/2006-7/10/2006, (Tr. 296-304)

On 2/22/06, Claimant's only complaint was two warts. On 5/8/06, he had the warts removed. He followed up on 6/8/06 and admits that he seems depressed and has been very moody and anxious since the injury in the car accident. On 7/10/06, he was in for a follow-up of depression which he states is doing great on the Lexapro. His primary complaint centers around knee pain. The pain is sharp and it hurts to move it or walk on it. He denies other related complaints. Upon examination, there is significant tenderness medially and inferiorly to the knee. There is crepitus upon extension and he is unable to flex it greater than 90 degrees.

## Mountainside Orthopedic Associataes, 11/1/05-10/5/06, (Tr. 307-311)

On 11/1/05, Claimant saw Dr. Darmeilo who found his knee was stable and an x-ray exam revealed congruent joint space and no significant evidence of arthritic wear. He prescribed Mobic for pain.

On 6/27/06, Dr. Darmeilo noted Claimant was not a candidate for knee replacement surgery.

On 9/19/06, Dr. Darmeilo noted that Claimant had an independent straight leg raise test and stable ligaments and referred him to David A. Stoll, M.D.

Dr. Stoll saw Claimant on 10/5/2006.  Physical examination revealed no effusion.  Quads atrophy.  Full range of motion.  Ligament stability is intact.  He does have patellofemoral apprehension and grind test and hesitance to bend past 90 degrees.  Assessment - patellofemoral arthrosis.  Recommendations - therapy for a patellar protection program.

**Levin & Associates, Marvin A. Levin, M.A., 11/14/2006, (Tr. 313-319)**

Adult Mental Profile:

General observations - Claimant was pleasant and cooperative throughout the session.  Posture was normal but gait was affected by a limp on his right side.

Psychosocial history - Except for financial pressure, things are good at home.

Chief complaints - crushed his knee in an automobile accident.

Presenting symptoms - Claimant presents with a significant knee injury.  Overall, his mood is euthymic and other than some sleep difficulties he appears to be in no psychological distress.

WAIS III
IQ Scale
| | |
|---|---|
| Verbal IQ | 74 |
| Performance IQ | 83 |
| Full Scale IQ | 76 |

Index
| | |
|---|---|
| Verbal Comprehension | 72 |
| Perceptual Comprehension | 91 |
| Working Memory | 80 |

Verbal Subtest
| | |
|---|---|
| Vocabulary | 4 |
| Similarities | 7 |
| Arithmetic | 8 |
| | |
| Digit Span | 4 |
| Picture Completion | 7 |
| Digital Symbol Coding | 5 |
| Block Design | 8 |
| Matrix Reasoning | 11 |
| Information | 4 |

| Comprehension | 7 |
|---|---|
| Letter Number Sequencing | (8) |
| Picture Arrangement | 6 |

<u>WRAT-III</u>
| Reading | 77 |
|---|---|
| Spelling | 69 |
| Arithmetic | 76 |

Diagnosis:
| Axis I | V71.09 | No conditions present |
|---|---|---|
| Axis II | V62.89 | Borderline intellectual functioning |
| Axis III | | Knee pain as a result of an accident |

D.    <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on November 8, 2006.  The following portions

of the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q    And who lives there with, you live there with your wife and anyone else?

A    And my son.

Q    And how old is your son?

A    18.

Q    And your birthday is February 5, '58?

A    '58?

Q    Is that right?

A    Yes, I didn't hear you.

Q    Yeah, '58.  And how far did you go in school?

A    I graduated

*            *            *

Q       Okay.  Did you ever have any vocational training after you left high school?

A       I went, let's see, during high school, my junior year, I went to Gore Career Center I think.

                    *               *               *

Q       And then did you work as an auto mechanic after?

A       Yes, sir, I did.

                    *               *               *

Q       Now, you indicate you've been disabled since around April of, April 1, of 2004. What happened then?  Were you injured or was your knee injured?

A       I was involved in a car wreck - -

Q       Car wreck?

A       - - coming home from work.  Yes, sir.

Q       Yeah.  And your, which knee was injured?

A       Right side.

Q       Right knee.  And it was crushed?

A       Yes.

                    *               *               *

Q       And then have you had any treatment in the last year or so?

A       Like?

Q       Well, any surgery or - -

A       No, there - -

                    *               *               *

Q        Yeah.  Why did they put you back in therapy again?

A        For pain and it will not bend much.

Q        Okay.  And your, so you originally had the surgery at the time of the accident?

A        Yes, sir.

*                    *                    *

Q        Okay.  What kind of treatment did you have after that, up until today?  I mean, I know you're in physical therapy now.

A        Right.  And I was in therapy then and back and forth with the doctors down here.

*                    *                    *

Q        What makes the pain worse in your knee?

A        I don't know.  You know, there's one day you'll get up.  You can't even hardly move.  The next day you can.

Q        So it's sort of unpredictable?

A        Very unpredictable.

Q        Okay.  How far can you normally walk in a stretch?

A        Not very far.

*                    *                    *

Q        How about standing, like if in, I don't mean like stand at attention but if you're like in an area of a sink or stove, how long could you stand at a stretch before you'd have to - -

A        10, 15 minutes maybe.

Q        How about any problems with sitting?

A        Yeah.  That's pretty uncomfortable.  Thank God we got a couch at our house that

reclines out.

Q    How long can you normally sit in a stretch?

A    How long can I stay sitting?

Q    Yeah.  In a normal chair like - -

A    Oh, I don't know.  Like here where I can stretch out?

Q    Yeah.

A    Half hour, 45 minutes.

                    *                    *                    *

Q    Do you have any problems with your hands or fingers?

A    They kind of wore out I think.  Kind of tight.

Q    But you're not getting any treatment for them?

A    No, no, sir.

Q    What's the most you think you could lift now and when I say lift, I don't mean

bend over to the floor but if you're sitting or standing at a table like this, how much do you think

you could pick up and say move to a refrigerator or move to another table or something like that?

A    And like just go from one place to other - -

Q    Yeah.

A    - - is that what you're saying?

Q    Yeah.

A    A gallon of milk.

                    *                    *                    *

Q    Do you use any cane or anything like that?

A        Yes, I do.

                        *                *                *

Q        Yeah.  Has your doctor put any restrictions on you or told you anything you

should avoid doing on account of your knee?

A        Pretty much everything I always used to do.

Q        Like what?

A        Any outdoor stuff, you know, watch where I'm at.  Just can't hardly do anything

because you can't bend.

                        *                *                *

Q        Right, it's approximately.  And you also have pain in the knee?

A        Pretty continuous.

Q        Okay.

A        Like Monday it was pretty swelled up and really burning.  It was hot which it

hasn't did that for maybe three or four days.

                        *                *                *

Q        Okay.  And where did you last work?

A        Pardon me?

Q        Where did you last work?

A        I worked at a labor's union but I was working for Aspen Tree Service.

                        *                *                *

Q        What did you do for them when you were working for West Virginia Paving?

A        I worked on the dirt crew which on the interstate, oh, just putting pipe in at

different jobs.  You know, it just varied.

*          *          *

Q	Okay.  And now, how do you spend your time most days?

A	Now?

Q	Um-hum.

A	Listen to the radio.  Wash dishes.

Q	Do you do any cooking or cleaning or laundry or anything like that?

A	I cook in the microwave.

Q	Microwave.  What kinds of things do you make in the microwave?

A	Whatever comes out of a can, pretty much, or my wife already fixes and leaves in

a bowl.

Q	Um-hum.

A	I'm no cook.

Q	Do you do any of the house cleaning or laundry?

A	I might dust a TV screen off, top of it, stuff that's higher up.

*          *          *

Q	Anything you still enjoy doing?

A	Just seeing my son.

*          *          *

Q	Some.  Do you ever get out to go to like a shopping mall for shoes or clothes?

A	No, sir.  I just, it's something I don't like to do and wouldn't do and never did.

Q	Do you ever, when you're around the house, do you do any gardening or lawn

13

work around the place?

A       I can mow part of our grass with a riding mower.

                    *               *               *

Q       Do you ever get out and go to like a restaurant or church or movie or anything like that?

A       I don't like watching TV really.  It hurts my eyes, that stuff does.  But I will go to church with my family now and then.

                    *               *               *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Mr. Guthrie, what position is most comfortable for your leg?

A       Kind of on the recliner chair or laying on the couch.

Q       Okay.  Then now, it's probably 9:30, 10 o'clock - - what do you do?

Q       Now, when you've been sitting here today, you leg, your right leg's completely out stretched.

A       Yes

Q       Is that more comfortable than having it bent a little bit?

A       Yes, you can't stand to keep it bent.

Q       Okay.  So if you have your leg completely out stretched, do you have pain?

A       Yes, I do, right now.

Q       But that's more if its bent?

A       Yeah, yes.

Q       Okay.  So you mentioned earlier some problems with swelling.

14

A        Yes.

Q        How often do you get problems with swelling in your leg?

A        In the last four weeks, I think three different times as I went to therapy which I know it is today.

*                *                *

Q        Now, when you have swelling how long does it usually last?

A        It will stay that way probably through tomorrow.

Q        And does the swelling have any connection with pain levels?

A        Yes, it does.

*                *                *

Q        How much of the time, out of a, on a good day are you able to be up and by up I mean not having your leg propped up.  Okay.  So having it down all day long?

A        I don't think so.

Q        Okay.  So on a good day, how much time do you spend with your leg propped up on something either in your recliner or propped up on your couch?  Say a regular work day, eight to give.

A        An eight hour day?

Q        Yes

A        Probably five and a half to six hours.

E.        Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- Watches tv (Tr. 73)

- Has difficulty getting dressed (Tr. 74)

- Prepares meals (Tr. 75)

- Washes dishes (Tr. 75)

- Occasionally goes outside (Tr. 76)

- Occasionally drives (Tr. 76)

- No longer able to hunt, fish or farm (Tr. 77)

- Spends time with others, talks on phone and socializes (Tr. 77)

- Uses a cane around the house (Tr. 79)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's credibility analysis was improper and not supported by substantial evidence.  Claimant argues that this ALJ, like many others, refused to follow the law regarding his subjective symptoms.  Specifically, Claimant alleges that the severity of his symptoms cannot be discredited solely because the severity is not supported by objective medical evidence.  Claimant cites Craig v. Chater, 76 F.3d 585 (4th Cir. 1996) to support this conclusion.  Claimant maintains that the entire case turns on the severity of his pain and limitations as they pertain to his severe knee injury and the ALJ's decision must be reversed because his reliance on the objective medical evidence to determine the credibility of the severity of his pain is an improper standard.

Commissioner maintains that substantial evidence supports the ALJ's credibility determination.  Specifically, Commissioner argues that the ALJ correctly considered the factors set

forth at 20 C.F.R. § 404.1529(c)(3)(i)-(vii), including claimant's daily activities, medical treatment, medication use and objective medical signs when determining that claimant's subjective complaints were not entirely credible. Commissioner further argues that claimant's medical treatment does not support his subjective complaints of disability. Additionally, Commissioner points out that claimant's representations of the limitations arising from his impairments are undermined by the medical opinions of his treating and examining physicians. Commissioner also notes that the ALJ found claimant's subjective complaints partially credible. Finally, Commissioner argues that Claimant's argument that the ALJ relied only on objective medical evidence to find Claimant not credible is incorrect. Commissioner argues that the ALJ not only considered Claimant's daily activities, but also considered his medication use, conservative medical treatment, past semi-skilled and skilled work history, and normal psychological examination.

B.     <u>The Standards</u>.

     1.     <u>Summary Judgment</u>. Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10.     <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to

observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

11. <u>Social Security - Claimant's Credibility - Pain Analysis</u>. The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

12. <u>Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work</u>. The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all

of the evidence presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

C.    Discussion

    1.    <u>Was the ALJ's Determination that Claimant's Subjective Complaints of Pain and Functional Limitation Were Not Entirely Credible Supported by Substantial Evidence?</u>

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in <u>Craig</u>, 76 F.3d at 585.  Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  <u>Id.</u> at 594.  The ALJ must "expressly consider" whether a claimant has such an impairment.  <u>Id.</u> at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  <u>Id.</u> at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to

cause the symptoms alleged.  <u>Id.</u>  However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself...are not present to corroborate the existence of pain."  <u>Id.</u>

The ALJ satisfied the first step of <u>Craig</u> by expressly considering whether Claimant has impairments that could cause the symptoms alleged.  <u>Id.</u> at 596.  The ALJ stated that "the claimant has underlying medically determinable impairments that could reasonably be expected to result in the symptoms alleged."  (Tr. 22).  Claimant has not challenged the ALJ's application of law at this step.

The ALJ also evaluated a significant amount of evidence at the second step of the <u>Craig</u> inquiry.  As Claimant admits, the ALJ discussed Claimant's activities of daily living.  (Tr. 22-23).  <u>Craig</u> provides that "evidence of the claimant's daily activities" should be considered.  <u>Craig</u>, 76 F.3d at 595.  Evidence of daily activities may show a person is not disabled.  <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992).  The ALJ noted the claimant's testimony regarding his activities of daily living.  Specifically that he performs limited household chores such as doing microwave cooking, washing dishes, and dusting, that he likes being with his son, that he enjoys playing with a pet beagle puppy, that he can cut grass using a riding mower, that he visits his mother several times weekly, that he occasionally goes to church, that friends come and visit him, and that he listens to the radio during the day.  (Tr. 22-23).  The ALJ found that "the level of activity as reported does not equate with the severity of physical or mental impairment as alleged."  (Tr. 23).  The ALJ was entitled to consider this evidence as tending to show Claimant was not disabled.  <u>Hunter</u>, 993 F.2d at 35.  <u>See</u> <u>also</u> <u>Yost v. Barnhart</u>, 79 Fed. Appx. 553, 555 (4th Cir. 2003) (claimant's "activities of daily living, including caring for his dogs, watching

television, visiting family and friends, attending church services, driving short distances, and occasional hunting support the ALJ's finding against disability").

The ALJ stated, "based upon a consideration of the subjective allegations weighed against objective medical evidence *and other relevant information bearing on the issue of credibility*, the undersigned finds that the claimant's assertions are not fully credible concerning the severity of his impairments, and on their impact on his ability to work. (Tr. 25, emphasis added). On the one hand, Claimant argues that the ALJ discredited him solely because there was insufficient objective medical evidence in the record to support his complaints of pain. On the other hand, in Claimant's own brief, he cites the seven inconsistencies the ALJ found and used to support his conclusion that Claimant was not fully credible. (Tr. 23-24). Claimant's argument that the ALJ discredited his subjective symptoms solely because the severity is not supported by objective medical evidence is simply without merit.

As for Claimant's credibility, the ALJ is in the best position to observe Claimant's demeanor during the hearing and evaluate his credibility. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). An ALJ's credibility determination will only be reversed if the claimant can show it was "patently wrong." Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). The Claimant has not made that showing here. The ALJ followed the law in his application of the established pain and credibility standards and his decision was supported by substantial evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ followed the applicable law in his application of the established pain and credibility standards and his decision was supported by substantial evidence.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: April 7, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE